**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

UNITED STATES OF AMERICA,

              Plaintiff,

vs.

YASIR JINNAH,

          Defendant.

Case No. 24-cr-30-CJW

**REPORT AND RECOMMENDATION
ON DEFENDANT'S MOTION TO
SUPPRESS**

_____

**TABLE OF CONTENTS**

                                                **Page**

I.     **INTRODUCTION**............................................................................2

II.    **FINDINGS OF FACT**.....................................................................3

III.   **DISCUSSION**.................................................................................8

      A.    *Parties' Arguments*.............................................................8

      B.    *Relevant Law*....................................................................10

      C.    *Analysis*............................................................................14

            1.    *The traffic stop*........................................................14

            2.    *Attenuation and* Leon.............................................28

IV.   **CONCLUSION**.............................................................................33

1

# I.    INTRODUCTION

On April 23, 2024, the Grand Jury returned an Indictment, charging Defendant Yasir Jinnah with one count of Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. Sections 922(g)(1), 922(g)(3), and 924(a)(8).  (Doc. 4.)  The matter before me is Defendant's motion to suppress.  (Doc. 39.)  The motion was filed June 17, 2024, and referred to Defendant's Exhibit B for an inventory of items to be suppressed.  (Doc. 40-1.)  The Government timely filed a response on June 24, 2024.  (Doc. 45.)  The Honorable C.J. Williams, Chief United States District Court Judge, referred the motion to me for a Report and Recommendation.  I held a hearing on Defendant's motion to suppress on July 11, 2024.  (Doc. 48.)

The motion arises from law enforcement's stop and subsequent search of Defendant's car.

Defendant moves to suppress any evidence obtained from the allegedly unlawful search on February 13, 2023, including any and all subsequently discovered evidence that was obtained as a result of the February 13, 2023 stop and subsequent vehicle search as fruit of the poisonous tree.  (Doc. 39.)  Evidence he seeks to suppress includes: a firearm and ammunition seized from Defendant's vehicle during the traffic stop and presumably any evidence obtained as a result of two search warrants executed after the February 13, 2023 stop.  (Def. Exs. B, C & D, Docs. 40-1, 40-2, 40-3.)

At the hearing, Defendant's Exhibits A-E were admitted without objection:

A. Trooper Trent McFarland dash camera video;

B. Iowa State Patrol Incident Report Supplemental;

C. Search Warrant dated March 28, 2023;

D. Search Warrant dated April 24, 2024; and

E. ATF Agent Robert Friend's Report of Investigation.

2

The Government called Iowa State Patrol Trooper Trent McFarland. Trooper McFarland has been with the Iowa State Patrol for seven years.[1] I found Trooper McFarland credible. For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## II.    FINDINGS OF FACT

On February 13, 2023, Trooper McFarland was working on Interstate 80 in Cedar County, within the Northern District of Iowa. At approximately 5:46 p.m., Trooper McFarland was parked in his patrol on a hard crossover near mile marker 276 and observed a black Chevy Malibu traveling eastbound at a speed well below the posted speed limit. Trooper McFarland noted that the Malibu maintained its speed below the posted speed limit as it approached him and appeared to decrease its speed as it passed him. (McFarland Hr'g Test. at 8-9.) Trooper McFarland also observed the driver of the Malibu as it passed him and noted that he looked "extremely rigid" in an uncomfortable driving position with his arms locked out on the steering wheel. Trooper McFarland stated that Defendant's driving position was atypical of normal driving behavior. Trooper McFarland testified that drivers are typically more relaxed. He stated that having one's arms locked out and rigid on the steering wheel is uncomfortable and a sign of anxiousness. (*Id.* at 9.) Further, as the Malibu proceeded past where Trooper McFarland was stationed, he observed it drift over the fog line, the line on right side of the lane "that

---

[1] Prior to working for the Iowa State Patrol, Trooper McFarland was employed by the Iowa Department of Transportation's Motor Vehicle Enforcement Division. Trooper McFarland graduated from the Iowa Law Enforcement Academy. Additionally, Trooper McFarland has completed advanced roadside impaired driving enforcement school and is also a certified recognition expert for detection of drug impaired driving. Trooper McFarland is also a canine handler. Trooper McFarland attended the Nebraska State Patrol Canine Handler School, graduating with his dog as a certified drug detector and patrol dog team. Trooper McFarland and his patrol dog re-certify annually and were certified at the time of the vehicle stop at issue here. Defendant raises no issue with regard to Trooper McFarland's dog's training or certification.

3

separates the driving lane from the shoulder of the roadway." (*Id.* at 10.) After the car passed him, Trooper McFarland pulled onto Interstate 80 to catch up and he observed it cross over the fog line a second time. (*Id.*)

Trooper McFarland explained that he pursued the vehicle because, in his training and experience, the Malibu's speed, well below the posted speed limit, as well as the failure to maintain its lane, and the driver's nervous behavior were consistent with an individual who was either potentially impaired or potentially involved in criminal activity. (*Id.*) When he caught up to the vehicle, Trooper McFarland pulled up parallel to it. Trooper McFarland stated that he wanted to see if the driver was on his cellphone or texting to perhaps explain why the vehicle had drifted over the fog line twice and why Defendant's driving behavior was atypical. Trooper McFarland did not observe anything to cause distracted driving behavior. (*Id.* at 11.) Trooper McFarland also noted that as he approached the vehicle it reduced its speed to 53 miles per hour in a posted 70 mile-per-hour zone. Additionally, Trooper McFarland observed that the driver remained in the rigid and unrelaxed driving position observed earlier. Further, Trooper McFarland noted that the driver would not take his eyes off the road and would not look over at him. Trooper McFarland testified that typically, when he pulls up next to a vehicle that he suspects may have an impaired driver, generally the driver will at least glance over at him. However, Defendant continued to look forward the entire time Trooper McFarland was next to him. At this point, Trooper McFarland decided to conduct a traffic stop of the car. (*Id.* at 11-12.)

After he stopped the car, Trooper McFarland approached the vehicle on the passenger side and spoke to the driver through the front passenger window. Trooper McFarland testified that as he approached the front passenger window, he briefly smelled

4

marijuana coming from inside the vehicle, but the smell quickly dissipated.[2]  (*Id.* at 13-14.)  Trooper McFarland identified the passengers of the vehicle by their drivers' licenses.  Defendant was the driver of the vehicle, and his passenger was co-defendant Daniella Maldonado.  Trooper McFarland told Defendant that he stopped his vehicle because he observed Defendant drive on the fog line and wanted to check and make sure Defendant was not an impaired driver.  (*Id.* at 14-15.)  He also advised Defendant that he would likely receive a warning.  Trooper McFarland explained that, if he determines that the motorist is not impaired, he typically gives the driver a warning for any fog line violation.  (*Id.* at 15.)

During the encounter, Trooper McFarland noted that Defendant was "very nervous."  (*Id.*)  Trooper McFarland testified that, when he asked Defendant to exit the vehicle and accompany him to his patrol car, Defendant grabbed the steering wheel in the same rigid manner that observed earlier with both of Defendant's arms locked out and Defendant staring straight ahead.  Trooper McFarland also observed Defendant's arms and torso trembling.  (*Id.*)  Trooper McFarland asked Defendant to step out of his vehicle a second time and this time Defendant complied and accompanied Trooper McFarland to his patrol car.  (*Id.* at 16.)  In the patrol car, Trooper McFarland asked Defendant about his travels.  Defendant told Trooper McFarland that he was going to Bolingbrook, Illinois for two or three days to visit his mother.  (*Id.* at 16-17.)  Trooper McFarland also asked Defendant why he was driving so slowly, and Defendant replied that he did not want to get caught speeding.  (*Id.* at 17.)  Further, Trooper McFarland inquired whether Defendant had any drugs or weapons in his car.  Defendant denied having either in the vehicle.  (*Id.* at 18.)  Trooper McFarland noted that Defendant's demeanor in the patrol car was "very anxious," "very nervous," and he could see

---

[2] Trooper McFarland testified that the smell of marijuana did not come from a passing car. (McFarland Hr'g Test. at 14.)

Defendant's heart beating rapidly through the carotid artery in Defendant's neck and through Defendant's T-shirt.[3]  (*Id.* at 17.)  Trooper McFarland asked Defendant for consent to search his car.  Defendant denied consent.  (*Id.* at 18.)

Trooper McFarland testified that he believed he had probable cause to search Defendant's vehicle based on the odor of marijuana that he smelled when he initially spoke to Defendant through the front passenger window.  (*Id.*)  However, because the odor dissipated quickly, out of an "over abundance of caution," Trooper McFarland decided to run his dog around Defendant's car to further support his probable cause to search.  (*Id.*)  Trooper McFarland testified that after he issued the warning citation, his investigation was not complete as he intended to further investigate the odor of marijuana he initially smelled emanating from the vehicle.  (*Id.*)

Trooper McFarland informed Defendant that he was going to run his dog around the car.  He asked Ms. Maldonado to exit the vehicle and once she exited the car, Trooper McFarland retrieved his dog and ran the dog around the car.  (*Id.* at 19.)  The dog alerted on the front passenger door by sitting, its final indication.  (*Id.* at 20; Def. Ex. A at 15:58-16:19.)  Trooper McFarland searched the vehicle.  He found a loaded handgun with a 15-round magazine in the center console of the car.[4]  A second spare 15-round magazine was also located in the center console.  Trooper McFarland also found a pink camouflage backpack in the car.  Inside the backpack, Trooper McFarland found three additional loaded 30-round handgun magazines, a trauma bleed stop kit, and a small

---

[3] At the time of the traffic stop, Defendant was wearing a long sleeve flannel shirt with a vest. (McFarland Hr'g Test. at 66; Def. Ex. A at 2:31.)

[4] The handgun was set up for a left-handed shooter.  Maldonado is right-handed.  Defendant is left-handed.  Maldonado, who claimed ownership of the gun told Trooper McFarland that it was set up for a left-handed person because she practices shooting with both hands.  (Def. Ex. B, Doc. 40-1.)

6

empty pouch that smelled of marijuana. Additionally, Trooper McFarland noted that there were no overnight bags or personal hygiene items in the car. (*Id.* at 21-22.)

After finding the firearm, Trooper McFarland conducted a criminal history check on Defendant and Maldonado. Maldonado had no criminal record. He learned that Defendant had a felony conviction for unlawful sale of a firearm without proper credentials. Thus, as a convicted felon, Defendant was prohibited from possessing a firearm. Trooper McFarland began the process of arresting Defendant for being a felon in possession of a firearm, however, Maldonado claimed ownership of the gun. She told Trooper McFarland that she purchased the gun at Cedar Valley Outfitters in Marion, Iowa. After speaking with Maldonado, Trooper McFarland released Defendant, seized the gun for further investigation, and advised Defendant that as a felon he was prohibited from being around firearms. (*Id.* at 23-24; Def. Ex. B, Doc. 40-1.) Trooper McFarland then let Defendant and Maldonado leave.

Later, Trooper McFarland contacted Cedar Valley Outfitters and confirmed that Maldonado had purchased the firearm from them. Also, the employee from Cedar Valley Outfitters with whom Trooper McFarland spoke expressed some suspicions/concerns based on the number of guns Maldonado had been purchasing from them. Trooper McFarland also performed an open-source social media search on Defendant and Maldonado. Lastly, Trooper McFarland contacted ATF Agent Robert Friend regarding Defendant and Maldonado, passing on the information he had learned about Maldonado and the gun. At some point, he delivered the seized firearm to Agent Friend.[5] (*Id.* at 24-26.)

_____

[5] While there was no testimony on the subject, it is clear from Defendant's Exhibits B and C that Agent Friend obtained two separate search warrants for Defendant's and Maldonado's residence, persons, and personal vehicles (the vehicle that Defendant was driving when he was stopped on February 13, 2023 was a rental car).

# III.   DISCUSSION

## A.   Parties' Arguments

Defendant argues that Trooper McFarland lacked probable cause to initiate a traffic stop. (Doc. 39-1 at 4.)  Defendant contends that the two alleged fog line violations, one which was not recorded on video, show "at most" a brief touching of the fog line and "cannot support probable cause for a traffic stop" under *State v. Tague*, 676 N.W.2d 197 (Iowa 2004).  (*Id.* at 6.)  Defendant maintains that "no additional factors supported the probable cause of the traffic stop."  (*Id.*)  Specifically, Defendant argues that "[m]omentary drifting from the road's center cannot constitute probable cause for a traffic stop on its own; nor does slow driving, momentary drifting and rigid arms on the wheel support the traffic stop when taken as a whole."  (*Id.*)

Defendant also argues that Trooper McFarland "lacked reasonable suspicion to prolong the traffic stop."  (*Id.* at 7.)  Specifically, Defendant asserts that Trooper McFarland did not have a "reasonably particularized suspicion that the marijuana smell emanate[d] from Defendant's car" because "Trooper McFarland did not smell a constant odor of marijuana emanating from the car."  (*Id.* at 8.)  Defendant maintains that "[a]lthough Trooper McFarland briefly detected the odor of marijuana during the traffic stop, the scent quickly disappeared and did not persist.  Given the nearby busy interstate with multiple passing cars, it is more likely the odor came from another vehicle."  (*Id.*)  Defendant contends that "[i]f the smell had been particularized to the Defendant's car, Trooper McFarland would have been able to smell it throughout (or at least more than once) during his prolonged interaction with the vehicle and its occupants."  (*Id.*)  Defendant asserts that "the fact that the trooper failed to find marijuana in the vehicle or on its passengers corroborates that it was a passing vehicle."  (*Id.*)  Further, Defendant argues that his "behavior toward the officer during the initial traffic stop did nothing to arouse the suspicions of some criminal activity by Defendant."  (*Id.* at 9.)

8

Lastly, Defendant argues that "evidence arising from the unlawful stop is not attenuated from the search warrants." (*Id.*) Specifically, Defendant argues that "[b]ecause the subsequent inquiries happened immediately after the unlawful seizure and search, the 'temporal proximity' factor does not favor a finding of attenuation." (*Id.* at 10.) Defendant argues that the "illegal seizures were the foundation of the resulting investigations" and, therefore, "[i]f not for the evidence obtained from the traffic stop and then the vehicle search, law enforcement would have had no basis for further action." (*Id.* at 11.) Finally, Defendant argues that the "kind of misconduct at issue" in this case should be deterred and supports a finding of no attenuation. (*Id.*) Defendant maintains that neither the first search of residence nor the second search of his residence was "sufficiently attenuated from the unlawful traffic stop" and any evidence obtained from either search of his residence "is fruit of the poisonous tree and should be suppressed." (*Id.*)

The Government argues that Trooper McFarland had probable cause to stop Defendant's vehicle based on Trooper McFarland's observation of traffic violations. (Doc. 45-1 at 6.) The Government points out that Trooper McFarland observed Defendant's vehicle drift across the fog line in violation of Iowa Code section 321.306, improper use of lanes. (*Id.* at 7-8.) Additionally, the Government points out that Defendant was driving 12 miles per hour under the posted speed limit on Interstate 80, dropped his speed to 17 miles per hour under the posted speed limit, was driving in a rigid uncomfortable manner, and did not look at Trooper McFarland when the trooper pulled along side of him. (*Id.* at 8.) The Government asserts that, "[u]nder the totality of the circumstances, [D]efendant's behavior, along with swerving over the fog line, appeared to indicate possible illegal activity or 'intoxicated or distracted driving' allowing the trooper to stop the vehicle." (*Id.*)

9

The Government also argues that "the traffic stop was not unconstitutionally prolonged by the dog sniff." (*Id.* at 9.) Specifically, the Government argues that, because Trooper McFarland smelled the odor of marijuana emanating from Defendant's vehicle during the traffic stop, Trooper McFarland had "the necessary reasonable suspicion to justify further detention" and "had probable cause to search the automobile." (*Id.* at 10.) Further, the Government points out that, while Trooper McFarland had probable cause to search the vehicle and extend the stop, he "took the less intrusive approach and ran his drug dog past the car." (*Id.* at 11.) The Government asserts that because the dog alerted on the vehicle, Trooper McFarland had additional probable cause to search the vehicle and prolong the stop. (*Id.*)

Finally, the Government argues that "even if the traffic stop was not lawful, the search warrants were sufficiently attenuated to purge any alleged taint of the stop." (*Id.* at 12.) Specifically, the Government argues that the three factors considered in determining attenuation support admission of the evidence obtained by execution of the two search warrants in this case. (*Id.* at 13-14.) The Government also argues that the "fruit of the poisonous tree" doctrine is inapplicable because there was no Fourth Amendment violation. (*Id.* at 15-16.) The Government maintains that "[i]f the Court finds a Fourth Amendment violation, the Court should deny the motion under the *Leon* good faith exception." (*Id.* at 16.)

**B.    *Relevant Law***

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.   "The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)); *Terry*

10

*v. Ohio*, 392 U.S. 1, 9 (1968)) (internal quotations omitted). "A traffic stop constitutes a seizure for purposes of the Fourth Amendment and therefore must be supported by probable cause or reasonable suspicion." *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014) (citing *United States v. Hollins*, 685 F.3d 703, 705-06 (8th Cir. 2012)). Officers may only conduct investigatory stops if they have reasonable suspicion that criminal activity may be afoot. *United States v. Patrick*, 776 F.3d 951, 954 (8th Cir. 2015).

In the context of traffic violations, a police officer may stop a vehicle only when the officer has "'at least a reasonable, articulable suspicion that criminal activity has occurred or is occurring,' and 'a traffic violation—however minor—creates probable cause to stop the driver of a vehicle.'" *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021) (quoting *United States v. Martin*, 411 F.3d 998, 1000 (8th Cir. 2005)). Generally, a traffic stop "is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). A minor traffic violation is sufficient to establish probable cause for an officer to conduct a traffic stop even if the stop is pretext for another investigation. *United States v. Sallis*, 507 F.3d 646, 649 (8th Cir. 2007) (quoting *United States v. Coney*, 456 F.3d 850, 855-56 (8th Cir. 2006)). An officer's actual motivation for making the stop beyond simply issuing a traffic violation is irrelevant provided that the officer has an objectively good reason for making the stop. *Id*.

Warrantless searches are *per se* unreasonable, with a few well-established exceptions. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). However, courts have long recognized the "automobile exception" to the Fourth Amendment. *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003); *see generally Carroll v. United States*, 267 U.S. 132, 158-59 (1925). "The so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, at the time of the search, they

have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Kennedy*, 427 F.3d at 1140-41 (citations omitted); *see also United States v. Castaneda*, 438 F.3d 891, 893 (8th Cir. 2006) ("The warrantless search of a vehicle is constitutional pursuant to the automobile exception to the warrant requirement, if law enforcement had probable cause to believe the vehicle contained contraband or other evidence before the search began.") (Quotation omitted)). The burden is on the Government to justify warrantless searches. *Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984).

In *Wells*, the Eighth Circuit Court of Appeals articulated probable cause for searching a vehicle during a lawful traffic stop:

> "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir.2000). . . . "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). "[W]hen police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982) (per curiam).

347 F.3d at 287-88.

In *United States v. Merrett*, 8 F.4th 743 (8th Cir. 2021), the Eighth Circuit stated:

> The Fourth Amendment requires law-enforcement officers to obtain a warrant before initiating a search, but "[d]uring a lawful investigatory [traffic] stop, officers may search a vehicle [without a warrant] when they develop probable cause to believe it contains contraband or evidence of criminal activity." *United States v. Williams*, 955 F.3d 734, 737 (8th Cir. 2020). During this traffic stop, officers smelled marijuana emanating from the SUV. And "[w]e have repeatedly held that the odor of marijuana

12

provides probable cause for a warrantless search of a vehicle under the automobile exception." *Id.* Thus, the officers' search of the SUV did not violate [the defendant's] Fourth Amendment rights.

*Id.* at 751.

"A seizure for a traffic violation justifies a police investigation of that traffic violation." *Rodriguez*, 575 U.S. at 354. The constitutionally acceptable length of the seizure of the individual involved "is determined by the seizure's 'mission.'" *Id.* (citing *Illinois v. Caballes,* 543 U.S. 405, 407 (2005)). Stops may last no longer than necessary to allow officers to achieve their stated purpose. *Id.* (citations omitted); *United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001)). "A seizure justified only by a police-observed traffic violation . . . 'becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission' of issuing a ticket for the violation." *Rodriguez*, 575 U.S. at 350-51 (quoting *Caballes*, 543 U.S. at 407) (brackets omitted)). Whether an officer has reasonable suspicion to expand the scope of a stop is determined by looking at "the totality of the circumstances, in light of the officer's experience." *United States v. Carrate*, 122 F.3d 666, 668 (8th Cir. 1997) (citations and quotation marks omitted).

The necessary length of a stop and necessary investigation will vary based on the circumstances of each case. An officer may detain a driver as long as reasonably necessary to conduct these investigative activities and to issue a warning or citation. *Jones,* 269 F.3d at 925 (citing *United States v. Wood,* 106 F.3d 942, 945 (10th Cir. 1997)). If, at any time during a reasonable traffic stop, an officer "develops a reasonable, articulable suspicion that a vehicle is carrying contraband," the officer may expand his intrusion into issues unrelated to any traffic offense. *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (quotations omitted). A dog sniff of the exterior of a vehicle during a lawful traffic stop does not violate the Fourth Amendment. *United States v. Rivera*, 570 F.3d 1009, 1012 (8th Cir. 2009) (citing *Illinois v. Caballes*, 543 U.S.

405, 409-10 (2005)); *see also United States v. Nguyen*, 59 F.4th 958, 964 (8th Cir. 2023) ("An open air dog sniff that does not prolong the initial purpose of a stop is permissible"); *United States v. Harry*, 930 F.3d 1000, 1005 (8th Cir. 2019) ("[A]s long as a traffic stop is not extended in order for officers to conduct a dog sniff, the dog sniff is lawful") (quoting *United States v. Fuehrer*, 844 F.3d 767, 773 (8th Cir. 2016)). However, a dog sniff cannot unreasonably prolong the stop absent "the necessary reasonable suspicion to justify a further detention or unless the continued encounter is consensual." *United States v. Munoz*, 590 F.3d 916, 921 (8th Cir. 2010) (citations omitted).

## C. *Analysis*

### 1. *The traffic stop*

Defendant's vehicle hit or touched the fog line on two occasions. (McFarland Hr'g Test. at 10; Def. Ex. A at 00:04-00:12 (second time vehicle touched fog line); Def. Ex. B.) Trooper McFarland gave Defendant a written warning for improper use of lanes, a violation of Iowa Code section 321.306.

Iowa Code Section 321.306, which regulates lane usage on divided highways, provides:

> Whenever any roadway has been divided into three or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply:
>
> 1. A vehicle shall be driven as nearly as practical entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made safely.

This provision has become a popular subject for contentious litigation as courts have attempted to determine when a driver's imperfect lane use constitutes probable cause for a stop.

In *State v. Tague*, 676 N.W.2d 197 (Iowa 2004), the Iowa Supreme Court interpreted Section 321.306(1) as follows:

The plain language of the statute requires that the driver of a vehicle must drive his or her vehicle as much as possible in a single lane, and that the driver cannot move from that lane to the shoulder or to another lane until the operator of the vehicle has ascertained whether he or she can move the vehicle safely. The dual purpose of the statute is to promote the integrity of the lane markings on the highway and to ensure the safe movement of vehicles on laned roadways. A violation does not occur unless the driver changes lanes before the driver ascertains that he or she could make such movement with safety.

*Id*. at 203. In *Tague*, the road in question was a four-lane highway with a painted median dividing the northbound and southbound lanes. 676 N.W.2d at 200. A police officer observed the defendant's left tires cross over the left edge line of the road and return to the roadway. *Id*. The Iowa Supreme Court determined that:

There was no other traffic on the roadway at the time Tague's vehicle crossed the edge line. He was not driving his vehicle in an erratic manner, violating any speed restrictions, or weaving his vehicle from side to side on the roadway. Despite the fact Tague's vehicle just barely crossed the left edge line for a brief period, the State failed to prove by a preponderance of evidence any objective basis to believe Tague's movement was done without first ascertaining that he could make such movement with safety. Thus, Tague's single incident of crossing the edge line for a brief moment under these circumstances did not give the police probable cause to stop Tague for a traffic violation under section 321.306.[6]

*Id*. at 203-04.

Recently, in an unpublished decision, the Iowa Court of Appeals addressed the issue that, under *Tague*, "'a single, isolated movement over a fog line' does not give rise to a reasonable suspicion for an investigatory stop." *State v. Murphy*, No. 21-0938, 978 N.W.2d 104 (Table), 2022 WL 1100904, at *1 (Iowa Ct. App. Apr. 13, 2022). In

---

[6] The Iowa Supreme Court concluded that "we do not believe the officer had probable cause to stop Tague's vehicle for a traffic violation under article I, section 8 of the Iowa Constitution." *Tague*, 676 N.W.2d at 204.

*Murphy*, on a two-lane divided highway, a sheriff's deputy observed a truck's passenger side tires cross the fog line and enter the shoulder of the road. 2022 WL 1100904, at *1. Ultimately, by the time the deputy activated his emergency lights, the truck had entered a residential neighborhood and pulled into a driveway. *Id*. While talking to the driver of the truck, the deputy noticed signs of intoxication and observed an open beer can in the console of the truck. *Id*. The driver failed field sobriety tests and the driver's breath test was over the legal limit. *Id*. The driver was charged with operating while intoxicated. *Id*.

The driver moved to suppress all the evidence derived from the traffic stop, arguing that there was not probable cause or reasonable suspicion to stop him. *Id*. At the state district court suppression hearing:

> when asked by the State to describe what he observed of Murphy's vehicle, the deputy testified: "I noticed that vehicle leave the road with its passenger side tires. . . . He was off on the shoulder, then back on the road. It wasn't sustained." He was unable to estimate how far off the road Murphy's vehicle traveled. But on cross-examination, the deputy said that Murphy's truck "left the road significantly" after crossing the right fog line and that it was "back on the road" in what he described as "a pretty sudden movement." The deputy testified that he initiated the traffic stop because he had previously dealt with impaired or intoxicated drivers, as well as those who had "drifted off the road" due to tiredness or medical issues, so he wanted "to see what this particular issue was."

*Id*. The state district court denied the motion to suppress. *Id*. at *2. The Iowa Court of Appeals reversed the state district court:

> Even if the movement of crossing the fog line itself was arguably more dramatic here than that in *Tague*, the bottom line is that there was no testimony or other evidence presented as to any other factors that would support a reasonable suspicion of Murphy's intoxication beyond that single act. *See* 676 N.W.2d at 205. The *Tague* court made clear that "*an isolated incident* of briefly crossing an edge line of a divided roadway" is insufficient on its own to justify a stop based on the driver's suspected

intoxication or fatigue. *Id.* at 205 (emphasis added). In cases in which reasonable suspicion was found in the traffic-stop context, the court in *Tague* specifically noted there was evidence of excessive speeding, swerving, repeated lane crossings, and otherwise erratic driving so as to give rise to a reasonable belief that the driver was impaired. *See id.* Those other factors are not present here. . . .

Based on the totality of the circumstances, we cannot conclude the deputy had reasonable suspicion to stop Murphy's vehicle. Consistent with *Tague*, and other cases in line with its facts, we do not believe Murphy's one-time act of crossing the fog line with his truck's passenger side tires gave rise to a reasonable suspicion that he was driving while intoxicated. *See, e.g.*, *State v. Lobo*, No. 17-1768, 2019 WL 762192, at *7 (Iowa Ct. App. Feb. 20, 2019) (Tabor, P.J., dissenting) (collecting cases that found no reasonable suspicion for a traffic stop). By focusing only on whether Murphy's truck crossed the fog line "just barely" and for how long, the district court overlooked the important point from *Tague*—that there must be more than a single instance of poor driving so as to distinguish between everyday drivers who make a momentary mistake and those who are reasonably suspected to be driving while impaired. *See* 676 N.W.2d at 205 (recognizing that failure to stay within lane lines "happens all too often" from drivers "talking on their cell phone, looking at a map, adjusting the radio, adjusting the heater, defroster or air condition, or checking on a child restrained in the back seat").

Like Murphy, we find it significant that the State failed to cite a single case from our appellate courts concluding "that a stop of a vehicle was constitutional based upon a single, isolated incident of crossing an edge or fog line." All of the cases upholding investigative traffic stops based on reasonable suspicion involved "more than a person weaving within their own lane or 'briefly crossing an edge line of a divided roadway.'" *See Lobo*, 2019 WL 762192, at *3 (collecting cases finding reasonable suspicion for a traffic stop).

*Id.* at *3-*4.

In another unpublished Iowa Court of Appeals decision involving a traffic stop where the driver was weaving in and out of his lane the appellate court found the stop

constitutional under *Tague*. *See State v. Allspach*, No. 15-0552, 882 N.W.2d 875 (Table), 2016 WL 2602655 (Iowa Ct. App. Mar. 9, 2016). In *Allspach*, the Court of Appeals determined that:

> Allspach's weaving was not a single "isolated incident," but a series of incidents within a short time frame. *State v. Tague,* 676 N.W.2d 197, 205 (Iowa 2004). The deputy testified he saw Allspach's truck touch the fog line or the dash line at least five times in less than one and a half minutes. *Cf. id.* (noting Tague's "left tires barely crossed the edge line once for a very brief period"); *State v. Nguyen,* No. 13–0045, 2013 WL 5498072, at *4 (Iowa Ct.App. Oct. 2, 2013) (noting the absence of "aggravated, continual, or pronounced weaving" within the lane); *State v. Troge,* No. 08–2029, 2009 WL 3064648, at *1 (Iowa Ct.App. Sept. 17, 2009) (noting vehicle "moved slowly near the center median once and moved slowly near the center line once"). In his experience, "with someone driving like that, it's a good possibility they are intoxicated." The district court gave credence to the deputy's testimony. We defer to this credibility finding. *See State v. Pals,* 805 N.W.2d 767, 771 (Iowa 2011).
>
> The deputy's observations were corroborated by a video recording of the encounter taken from the deputy's vehicle. The video captured multiple contacts between the vehicle and the painted lines on either side of the lane. *See State v. Fischels–Wordehoff,* No. 05–0762, 2006 WL 782447, at *2 (Iowa Ct.App. Mar. 29, 2006) (noting videotape showed the "defendant's vehicle drifting from side to side in the lane"). The video also documented the absence of severe weather conditions, roadway obstacles, or other vehicles that might have explained the weaving.
>
> We conclude the deputy "had specific and articulable facts, which taken together with rational inferences from those facts" would have reasonably led him to "believe criminal activity may have occurred." *Tague,* 676 N.W.2d at 204; *State v. Otto,* 566 N.W.2d 509, 511 (Iowa 1997).

*Id*. at *1-*2; *see also State v. Struve*, 956 N.W.2d 90, 104 (Iowa 2021) ("Yet the cases where we found reasonable suspicion of impaired driving to support a stop did not involve activity consistent only with illegal conduct. Weaving within one's own lane and changing speeds without exceeding the speed limit do not violate any statute, but they do

18

provide evidence of impairment. The difference between Tague's isolated and limited action and . . . repeated and more dramatic actions . . . [does] not turn on whether the observed conduct was consistent only with illegal conduct to the exclusion of legal conduct, but whether it provided an objective indication of illegality.").

In another more recent unpublished Iowa Court of Appeals decision where the driver was weaving in her lane, touched the dashed center line and solid edge line, varied her speed to twenty miles below the speed limit, and almost missed her exit, the appellate court determined that a traffic stop on suspicion of driving while intoxicated did not violate the driver's constitutional rights. *See State v. Gomez-Torres*, No. 23-0521, 998 N.W.2d 890 (Table), 2023 WL 8070023 (Iowa Ct. App. Nov. 21, 2023). The Court of Appeals outlined the following facts:

> At approximately 2:34 a.m. on September 22, 2022, Story County Sheriff's Deputy Matthew Massaro observed a vehicle drive over the dashed white center line on the westbound Highway 30 exit ramp (the flyover or overpass) coming off of Interstate 35 and noted the driver continued driving in the middle of the two lanes on the second portion of that flyover. As he continued behind the vehicle, he also saw it weave within its lane and vary its speed from sixty-five miles per hour (mph) on the flyover to forty-five and back up to fifty-five mph on Highway 30, even though the speed limit was sixty-five mph. After the driver activated the turn signal late, the deputy noted the driver appeared to almost miss the turn onto the University Boulevard exit ramp off of Highway 30, and the vehicle drove over the exit ramp's solid white lines and the gore[7] in the process. It was at that point that Deputy Massaro initiated a traffic stop of the vehicle.

*Id*. at *1. The Court of Appeals analyzed the case in light of *Tague*:

> Our supreme court established the bright-line rule that a single incident of briefly crossing the edge line of a divided highway, absent more, is not

---

[7] As *Gomez-Torres* explained, "the gore is the triangular part of a highway in between the highway's lanes and an exit ramp." 2023 WL 8070023, at *1, n.1 (citing *Gore,* Merriam-Webster (3rd ed. 2002)).

enough to raise reasonable suspicion of criminal activity. [*Tague*, 676 N.W.2d] at 205–06[.] . . .

However, in interpreting *Tague*, we have repeatedly found that a vehicle that does more than cross the edge line once for a couple of seconds may raise reasonable suspicion that the driver is intoxicated. *See State v. Lobo*, No. 17-1768, 2019 WL 762192, at *3 (Iowa Ct. App. Feb. 20, 2019) (collecting cases finding reasonable suspicion based on crossing of center and edge lines along with time of night); *see State v. Keith*, No. 17-1044, 2018 WL 2174089, at *2 (Iowa Ct. App. Apr. 4, 2018) (collecting cases finding reasonable suspicion based on swerving, weaving, and crossing of center and edge lines). In fact, when considering a set of similar circumstances, we determined that the stopping officer had reasonable suspicion to support the traffic stop. *See State v. Sorenson*, No. 14-1101, 2016 WL 718984, at *1 (Iowa Ct. App. Feb. 24, 2016) (finding reasonable suspicion when a vehicle made a wide turn on a corner, crossed "the center line on occasion," and weaved over the fog line before "crossing a rumble strip, leaving the travel portion of the highway and driving on the shoulder until" coming to a stop sign). Even more, our supreme court has clarified the *Tague* standard to add that "[w]eaving within one's own lane and changing speeds without exceeding the speed limit do not violate any statute, but they do provide evidence of impairment." *State v. Struve*, 956 N.W.2d 90, 104 (Iowa 2021). And we consider the totality of all observed driving behaviors in determining whether reasonable suspicion of impaired driving existed. [*State v.*] *McIver*, 858 N.W.2d [699,] 702 [(Iowa 2015)].

Here, Deputy Massaro observed more than a single crossing of the white edge line of the highway. Instead, he testified to—and the dash camera footage supported—"something more": Gomez-Torres driving down the middle of two lanes over the dashed line dividing the lanes, weaving in her lane and touching the dashed center line and solid edge line in the process, varying her speed to twenty miles below the speed limit, almost missing her exit and activating her turn signal only after doing so, and driving over the gore area next to the exit while crossing the solid white line separating the exit from the highway lanes. Taken together, these actions rise above the level of a single isolated incident of briefly touching the edge line. Therefore, Deputy Massaro had sufficient evidence of impairment to raise a reasonable and articulable suspicion of criminal activity, namely, that

Gomez-Torres was driving while intoxicated, and the warrantless traffic stop was not a violation of her constitutional rights.

*Id.* at *3.

In *United States v. Herrera-Gonzalez*, 474 F.3d 1105 (8th Cir. 2007), the Eighth Circuit Court of Appeals addressed a traffic stop based on Iowa Code Section 321.306. In *Herrera-Gonzalez*, a sheriff's deputy, while traveling on a four-lane interstate highway, observed a vehicle cross the fog line on the right side of the right line for approximately 10 to 15 seconds. *Id.* at 1107. The Eighth Circuit noted that:

> Prior to this observation, [the deputy] had not observed any other violations or unusual driving. At the time Herrera-Gonzalez crossed the line, two tow trucks were 50 to 100 yards ahead, partly in the median and partly on the left shoulder of the highway. Nothing was blocking the right shoulder when he crossed the fog line. Prior to reaching the tow trucks, however, Herrera-Gonzalez moved back into the right lane of travel as he approached a short bridge that was just before the tow trucks. After crossing the bridge, Herrera-Gonzalez "hugged" the fog line until he passed the tow trucks, at which point he resumed travel in the center portion of the right lane.

*Id.* Both because driver crossed the fog line and because he was concerned that the driver might be impaired, the deputy stopped the vehicle. *Id.* The federal district court determined that the stop violated the Fourth Amendment because the deputy "did not have an objectively reasonable basis to believe a traffic violation had occurred." *Id.* at 1108. Specifically, the district court found that "there was 'no factual basis for a conclusion that the Defendant's modest movement from his lane of travel could not be "made with safety"' and that the fog-line crossing could reasonably be interpreted as an attempt to give the tow truck workers more room." *Id.*

The Eighth Circuit reversed the district court, first noting that:

> Federal courts of appeals, including this one, have reached different conclusions on the objective reasonableness of traffic stops based on statutes very similar to § 321.306, depending on the particular circumstances of

each case. *Compare United States v. Herrera Martinez,* 354 F.3d 932, 933-34 (8th Cir.2004) (per curiam) (concluding that the officer had probable cause to make a traffic stop where the officer observed no other traffic violations than a single fog-line crossing); *United States v. Pulliam,* 265 F.3d 736, 739 (8th Cir.2001) (concluding that a traffic violation had occurred where the officer observed the driver drift over the fog line twice in two miles); *United States v. Alvarado,* 430 F.3d 1305, 1309 (10th Cir.2005) (holding that an officer had a reasonable, articulable suspicion that the driver had committed a traffic violation where the defendant briefly crossed the fog line once and failed to point to any objective factor that might have interfered with his ability to keep his vehicle in a single lane; noting particularly the absence of any adverse weather or road conditions that would necessitate crossing the line); *United States v. Zabalza,* 346 F.3d 1255, 1258 (10th Cir.2003) (concluding that the officer had "more than the necessary objectively reasonable, articulable suspicion" that the driver had committed a traffic violation where he observed the vehicle cross the center line twice), *with United States v. Gregory,* 79 F.3d 973, 978 (10th Cir.1996) (finding no reasonable suspicion based on an isolated incident of a vehicle crossing the fog line where the road was winding and mountainous and the weather condition was windy); *United States v. Freeman,* 209 F.3d 464, 466 (6th Cir.2000) (finding no probable cause based on single incident of a large motor home crossing the fog line for a few feet).

*Id*. at 1109-10. The Eighth Circuit also considered *Tague*, noting that the case:

bears some relevance to our objective reasonableness inquiry because a state's judicial interpretation of a state statute can aid in determining whether an officer's actions had some basis in state law. *Cf.* [*United States v.*] *Washington,* 455 F.3d [824,] 828 [(8th Cir. 2006)] (noting that the concept of an objectively reasonable mistake of law cannot be unmoored from actual legal authority; noting the government's failure to provide evidence of, among other things, state case law that would create some objectively reasonable basis for the traffic stop where the statute clearly did not prohibit the conduct the officer thought it did); [*United States v.*] *Martin,* 411 F.3d [998,] 1001 [(8th Cir. 2005)] (noting the lack of evidence in the record of previous judicial interpretations of the statute that might aid in the objective reasonableness inquiry, given the statute's "unusual text"). In *Tague*, the officer observed no suspicious driving other than that

the vehicle had "just barely crossed the left line for a brief period." *Tague,* 676 N.W.2d at 204. Given the State's "failure to prove . . . any objective basis to believe Tague's movement was done without first ascertaining that he could make such movement with safety," the court held that the officer did not have probable cause under the Iowa Constitution to stop the driver for a violation of § 321.306. *Id.*

*Id.* at 1110. Further, the Eighth Circuit pointed out that the district court did not:

> make factual findings as to whether Herrera-Gonzalez first ascertained that the move could be made with safety or whether the position of the tow trucks in the median and on the left shoulder actually made it impractical for him to stay in the right-hand lane of the interstate. *See* Iowa Code § 321.306 ("A vehicle shall be driven as nearly as practical entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."). In fact, the suppression hearing transcript reveals that after traveling 10 to 15 seconds straddling the fog line, Herrera-Gonzales crossed back into the right lane in order to cross the bridge before reaching the tow trucks. This at least suggests an objective basis for believing Herrera-Gonzalez did not ascertain that his initial crossing of the fog line could be accomplished safely. Herrera-Gonzalez then remained in the right lane hugging but not crossing the fog line as he passed the tow trucks, which raises the further question of whether it was impractical for him to stay in his lane in the first place. Indeed, [the deputy] testified that the tow trucks' position in the median and on the left shoulder did not make staying in the right lane impractical and that he simply moved his patrol car from the left lane of the interstate to the right lane in order to avoid the tow trucks. Given these differences between the circumstances of this case and those in *Tague*, *Tague's* holding does not compel the conclusion that [the deputy's] belief that Herrera-Gonzalez violated § 321.306 was objectively unreasonable.

*Id.* The Eighth Circuit explained that:

> under the circumstances of this stop—the 10 to 15 second crossing of the fog line, the time of day (morning), the clear weather conditions, the fact that there was a full lane of travel between Herrera-Gonzalez and the tow trucks, the lack of any additional adverse conditions that would have made it impractical for Herrera-Gonzalez to keep his car in the lane, and the fact

that Herrera-Gonzalez returned to his lane to avoid the bridge and then continued within his lane as he passed the tow trucks—and given the obvious difficulty of observing from a patrol car whether a driver has ascertained that his move can be safely made, we conclude that [the deputy] had an objectively reasonable basis to believe that a violation of the Iowa statute had occurred. *See Alvarado*, 430 F.3d 1305, 1309; *cf. Washington*, 455 F.3d at 828 (noting that where there is a basis in state law for an officer's actions and some ambiguity exists that caused the officer to make the mistake, it may still be objectively reasonable). We recognize that this is a relatively close question, but we believe that based on what he reasonably knew at the time of the stop, [*United States v.*] *Smart*, 393 F.3d [767,] 770 [(8th Cir. 2005)], [the deputy] "could have formed" a reasonable suspicion that Herrera-Gonzales had committed a traffic violation, *Martin*, 411 F.3d at 1001.

*Id*. at 1110-11. Thus, the Eighth Circuit found the stop lawful.

Here, at approximately 5:46 p.m., Trooper McFarland observed Defendant's vehicle traveling eastbound at a speed well below the posted speed limit (58 miles per hour in a 70 mile per hour zone). Trooper McFarland noted that Defendant's vehicle maintained its speed below the posted speed limit as it approached him and appeared to decrease its speed, down to 53 miles per hour, as it passed him. Trooper McFarland also observed that Defendant, the driver, looked "extremely rigid" and in an uncomfortable driving position with his arms locked out on the steering wheel, an atypical driving position from normal driving behavior. Trooper McFarland stated that generally drivers are more relaxed and Defendant's driving behavior was a sign of anxiousness. Additionally, Trooper McFarland observed Defendant's vehicle drift over the fog line on two separate occasions, once as Defendant was approaching him and once when he pulled onto Interstate 80 to catch up to Defendant. Trooper McFarland noted that when he pulled up next to Defendant's vehicle, Defendant did not look over at him, which was strange as most drivers at a minimum would normally glance over at him. (McFarland Hr'g Test. at 8-12.) Finally, Trooper McFarland noted that driving below the speed limit

is uncommon for young drivers, although it is more typical for commercial motor vehicles, larger profile vehicles, or elderly drivers. (*Id.* at 70.) Defendant's age was not made a part of the record, but he appears to be a young man and far from elderly.

While the traffic violations occurred at dusk, there is no evidence in the record that there were any obstacles on the roadway which would have caused erratic driving. The dash camera shows no obstacles in the roadway and no weather conditions affecting Defendant's ability to stay in his lane. (Def. Ex. A at 00:00-00:38.) Furthermore, I find Trooper McFarland's testimony credible. Like *Herrera-Gonzalez*, I find it reasonable that in clear driving conditions, Trooper McFarland's observation of Defendant's vehicle touching or hitting the fog line two different times in a short period of time while traveling over a short distance, combined with Defendant's atypical and anxious driving behavior and driving 12 to 17 miles per hour under the posted speed limit on an interstate highway, "could have formed" a reasonable suspicion that Defendant had committed a traffic violation, *see* 474 F.3d at 1111, and Trooper McFarland "had specific and articulable facts, which taken together with rational inferences from those facts" would have reasonably led him to "believe criminal activity may have occurred."[8] *Allspach*, 2016 WL 2602655, at *1-*2; *see also Gomez*, 2023 WL 8070023, at *3. Accordingly, I find that Trooper McFarland had probable cause to conduct the traffic stop.

---

[8] Defendant's citation to *State v. Brown*, 509 N.W.2d 69 (N.D. 1993) for the proposition that "[t]he mere fact that a driver is traveling at a slower than usual speed on a roadway does not by itself create a reasonable suspicion of driving under the influence of alcohol or of other illegal activity" is of no avail. *Id.* at 71. It is significant in *Brown* that the North Dakota Supreme Court found the driver of the vehicle had violated no traffic laws. *Id.* This fact alone makes *Brown* distinguishable from the present case, as Defendant's vehicle, in addition to driving significantly under the speed limit on an interstate, also crossed or touched the fog line on two separate occasions which constitutes a traffic violation under Iowa law. Similarly, simply because Defendant's arms were in the proper position on the steering wheel does not take away from Defendant's atypical driving position, which was rigid, unrelaxed, and anxious. Defendant cites no authority that Trooper McFarland improperly took Defendant's atypical and anxious driving behavior into consideration while making his calculation to stop Defendant's vehicle.

The traffic stop was not unconstitutionally prolonged. Trooper McFarland testified that when he approached the front passenger window and was bending down to speak with the occupants of the vehicle, he briefly smelled the odor of marijuana. (McFarland Hr'g Test. at 13, 53.) Trooper McFarland also testified that the odor of marijuana emanated from inside Defendant's vehicle. (*Id.* at 13-14.) Additionally, Trooper McFarland testified that he did not believe that he had ever detected the odor of marijuana emanating from a passing car with its windows down on an interstate highway. (*Id.* at 52.) Further, Trooper McFarland noted that Defendant's demeanor in the patrol car was "very anxious," "very nervous," and he could see Defendant's heart beating rapidly through the carotid artery in Defendant's neck. (*Id.* at 17.)

As discussed above, I find Trooper McFarland credible. Therefore, I find that Trooper McFarland had probable cause to search Defendant's vehicle based solely on the odor of marijuana. *See Williams*, 955 F.3d at 737 ("We have repeatedly held that the odor of marijuana provides probable cause for a warrantless search of a vehicle under the automobile exception"); *United States v. Smith*, 789 F.3d 923, 928 (8th Cir. 2015) ("This court has held numerous times that the smell of marijuana coming from a vehicle during a proper traffic stop gives an officer probable cause to search for drugs."). Furthermore, Defendant's nervous an anxious demeanor properly contributed to Trooper McFarland's finding of reasonable suspicion. *See United States v. Anguiano*, 795 F.3d 873, 877 (8th Cir. 2015) (finding that defendants who "were visibly 'extremely nervous' throughout the encounter, exhibiting high pulse rates and heavy breathing, and avoiding eye contact with [the officer], all of which . . . contribute[d] to a finding of reasonable suspicion") (citing *United States v. Riley*, 684 F.3d 758, 763–64 (8th Cir.2012)).

Moreover, this case is analogous to *Smith*, where a vehicle was pulled over for speeding. 789 F.3d at 926. While speaking with the driver the law enforcement officer "noticed a 'slight odor of marijuana' coming from inside the car." *Id*. The officer told

the driver that he could smell marijuana and requested permission to search the vehicle. *Id*. After speaking with the driver for a couple of minutes and failing to obtain consent to search the car, the officer called for a K-9 unit to conduct a dog sniff around the vehicle. *Id*. The K-9 unit arrived 17 minutes after the initial traffic stop and 11 minutes after the officer sought permission from the driver to search the car. *Id*. The defendant in *Smith* argued that the officer "did not have a reasonable, articulable suspicion sufficient to justify an investigative *Terry* stop because the faint smell of marijuana alone was insufficient." *Id*. at 928. The Eighth Circuit noted that the defendant "asks this court to distinguish between a faint smell and a strong smell in determining whether the marijuana odor is enough to prolong a stop." *Id*. at 929. The Eighth Circuit determined that:

> we find the smell of marijuana, along with the credible testimony by the officer, is sufficient to establish probable cause to search an automobile and its contents. Here, [the officer] testified that he had been trained in the detection of controlled substances, including the odor of both raw and burned marijuana. The lower court credited [the officer's] testimony and noted that, while he had probable cause to search the vehicle, [the officer] took the less intrusive approach and called the K–9 unit. . . . Because the prolonged stop was justified, the district court did not err in denying [the defendant's] motion to suppress evidence retrieved from the car. *United States v. Portmann*, 207 F.3d 1032, 1033 (8th Cir.2000).

*Id*.

Similarly, here, while Trooper McFarland had probable cause to search Defendant's vehicle based on the odor of marijuana that he smelled coming from Defendant's car when he initially bent down at the front passenger window to talk to Defendant and Maldonado, Trooper McFarland took a less intrusive approach and ran his dog around the car. The dog sniff itself took 58 seconds.[9] (Def. Ex. A at 15:21-

---

[9] During the dog sniff, Trooper McFarland's dog alerted on Defendant's front passenger door; i.e., the dog sat. The dog's alert/indication also gave Trooper McFarland probable cause to search the car. *See United States v. Rederick*, 65 F.4th 961, 967 (8th Cir. 2023) ("'[A]n alert

16:19.)  It took 1 minute and 28 seconds for Trooper McFarland to ask Defendant if there was anything illegal in his car, tell Defendant he was going to run his dog around the car, ask Maldonado to exit the vehicle, and retrieve his dog to the start of the dog sniff. (Def. Ex. A at 13:53-15:21.)  Because Trooper McFarland had probable cause to search Defendant's vehicle based on the odor of marijuana emanating from inside the vehicle and it took a total of 2 minutes and 30 seconds from the time Trooper McFarland asked Defendant whether there was anything illegal in the car to the end of the dog sniff, like in *Smith*, I find that the length of the stop was justified.[10]  *See Sanchez*, 417 F.3d at 975 (providing that, if, at any time during a reasonable traffic stop, an officer "develops a reasonable, articulable suspicion that a vehicle is carrying contraband," the officer may expand his intrusion into issues unrelated to any traffic offense) (quotations omitted).

### 2.    *Attenuation and* Leon

If the Court disagrees regarding my foregoing recommendations, it may need to address whether the subsequently discovered evidence from the two search warrants should be suppressed as fruit of the poisonous tree.  The Government asserts that, "even

---

or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle.' *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010).") (alteration in original); *United States v. Jackson*, 811 F.3d 1049, 1052 (8th Cir. 2016) ("The positive alert by a reliable drug dog alone establishe[s] probable cause."). Defendant does not dispute Trooper McFarland's and his dog's training and certification.

[10] Defendant's reliance on *United States v. Shumaker*, 21 F.4th 1007 (8th Cir. 2021) is misplaced and easily distinguishable.  In *Shumaker*, officers in a patrol car with its back windows down, followed a car with its passenger window down for 30 seconds to confirm that the smell of burnt marijuana was coming from the car.  *Id.* at 1009-10.  Based on the smell of marijuana, the officers conducted a *Terry* stop on the car.  *Id.* at 1010.  Here, unlike *Shumaker*, Trooper McFarland stopped Defendant based on a traffic violation and suspicion of impaired driving. Moreover, Trooper McFarland testified that he smelled the odor of marijuana emanating from Defendant's vehicle when he initiated contact with Defendant and Maldonado and bent down to speak with them through the front passenger window.  As discussed above, Trooper McFarland had probable cause to search Defendant's vehicle based solely on the odor of marijuana emanating from Defendant's car.  *See Williams*, 955 F.3d at 737; *Smith*, 789 F.3d at 928.

if the traffic stop was not lawful, the search warrants were sufficiently attenuated to purge any alleged taint from the stop." (Doc. 45-1 at 12.)

Under the attenuation doctrine, a constitutional violation leading to the discovery of evidence does not require exclusion when only an attenuated connection exists between the constitutional violation and discovery of the evidence. *Utah v. Strieff*, 579 U.S. 232, 238 (2016). *Strieff* stated, "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Id.* (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)).

The Eighth Circuit has held:

At issue is the "attenuation doctrine," an exception to the exclusionary rule that applies "when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Utah v. Strieff*, ––– U.S. –––, 136 S. Ct. 2056, 2061, 195 L.Ed.2d 400 (2016) (quoting *Hudson v. Michigan*, 547 U.S. 586, 593, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006)).

We use a three-part test to determine whether the attenuation doctrine applies. "First, we look to the temporal proximity between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Second, we consider the presence of intervening circumstances. Third, and particularly significant, we examine the purpose and flagrancy of the official misconduct." *Id.* at 2062 (citations omitted).

*United States v. Lowry*, 935 F.3d 638, 642–43 (8th Cir. 2019).

Here, Trooper McFarland immediately seized the gun he found during the search of Defendant's vehicle. While the gun seized during the traffic stop is not the subjection of the indictment, it was used to obtain the March 28, 2023 search warrant. (Def. Ex.

C.)  The evidence from the March 28, 2023 search warrant was then used to obtain the April 24, 2024 search warrant.  (Def. Ex. D.)  Moreover, in his report, dated February 13, 2023, the date of the traffic stop and seizure of the firearm, Trooper McFarland stated: "I seized the gun for further investigation as I intend to follow up with Cedar Valley Outfitters."  (Def. Ex. B.)  Trooper McFarland's report also stated that the "investigation is ongoing."  (*Id.*)  Trooper McFarland contacted Cedar Valley Outfitters and confirmed that Maldonado had purchased the seized firearm from them.  He also learned that Maldonado had recently purchased multiple guns from them.  Further, Trooper McFarland performed an open-source social media search on Defendant and Maldonado.  (McFarland Hr'g Test. at 24-25.)  Trooper McFarland passed the information he learned about the seized gun, the other firearms purchased by Maldonado, and the social media search to ATF Agent Robert Friend.  Agent Friend reviewed the social media accounts by February 21, 2023, eight days after the traffic stop and seizure of the gun.  (Def. Ex. C.)  Based on the foregoing facts, the investigation into Defendant and firearms appears to have progressed deliberately, if not quickly, from the initial seizure of the firearm through the two search warrants.  Accordingly, I find that the first factor weighs against a finding of attenuation.

Regarding the second factor, the facts laid out in my discussion of the first factor do not support a finding of intervening circumstances.  The Government asserts that ATF Agent Friend began a separate investigation that resulted in obtaining the two search warrants.  However, Agent Friend's investigation and obtaining the search warrants was the result of Trooper McFarland's investigation of the firearm seized during the traffic stop.  Therefore, based on the foregoing, the second factor weighs against  finding attenuation.

Regarding the third factor,

> The Supreme Court places a particular emphasis on any 'purpose and flagrancy of the official misconduct' in effecting the initial illegal entry." *United States v. Brandwein*, 796 F.3d 980, 985 (8th Cir. 2015), quoting *Brown v. Illinois*, 422 U.S. 590, 603–04 1975. "Application of the exclusionary rule . . . does not serve [its] deterrent function when the police action, although erroneous, was not undertaken in an effort to benefit the police at the expense of the suspect's protected rights." *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006) (quotation omitted). "An unreasonable mistake alone is not sufficient to establish flagrant misconduct." *United States v. Herrera–Gonzalez*, 474 F.3d 1105, 1113 (8th Cir. 2007); *see Strieff*, 136 S.Ct. at 2063.

*United States v. Yorgensen,* 845 F.3d 908, 915 (8th Cir. 2017). Even if Trooper McFarland lacked probable cause for the initial stop (and I have found there was probable cause), there is no evidence of any misconduct or any intention to benefit the police at the expense of Defendant's rights as described in *Yorgensen*. Trooper McFarland observed a traffic violation (twice crossing or touching the fog line) and unusual driving behavior by Defendant leading him to stop Defendant's vehicle. Trooper McFarland smelled marijuana emanating from Defendant's vehicle and then ran his dog around the vehicle where the dog alerted on the front passenger door. This is not the type of behavior that requires deterrence. Thus, the third factor weighs in favor of finding attenuation.

Having considered the three factors, I conclude that the first and second factors which weigh against a finding of attenuation outweigh the third factor favoring attenuation. Accordingly, I recommend that, if the Court disagrees with my findings regarding the traffic stop and search of Defendant's vehicle, the Court find that the attenuation doctrine is inapplicable in this case.

Alternatively, the Government argues that "the search warrants were supported by probable cause and were executed in good faith"; therefore, "[n]one of the evidence should be excluded as the fruit of a poisonous tree." (Doc. 45-1 at 15.) Under the good

faith exception articulated in *United States v. Leon*, even if a reviewing court determines substantial evidence to issue a warrant is absent, the court should not suppress evidence seized pursuant to the search warrant if the officers executing the search warrant acted in objectively reasonable reliance on the issuance of the warrant by a neutral magistrate or judge. 468 U.S. 897, 922 (1984); *United States v. Houston*, 665 F.3d 991, 994-95 (8th Cir. 2012). "In making this determination, we ask 'whether a reasonably well-trained officer would have known that the search was illegal despite a judge's issuance of the warrant.'" *United States v. Lopez-Zuniga*, 909 F.3d 906, 909 (8th Cir. 2018) (quoting *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015)).

Under the "good-faith exception," if a law enforcement officer's reliance on a warrant was objectively reasonable, the evidence seized pursuant to an invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). *Proell* noted that *Leon* identified four scenarios where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Id*. at 431 (citing *Leon*, 468 U.S. at 923; *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)).

*Leon* explained that "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a judge normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will

have no reasonable grounds for believing that the warrant was properly issued." *Id*. at 922-23 (footnote omitted). "For the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, [law enforcement's] prewarrant conduct must have been 'close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable.'" *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)). If the prewarrant conduct is clearly illegal, however, the exception does not apply. *Cannon*, 127 F.3d at 413.

None of the four scenarios contemplated by *Leon* apply here. As discussed above, I find that the traffic stop was legal and Trooper McFarland's smelling the odor of marijuana emanating from Defendant's vehicle coupled with Defendant's nervous and anxious behavior provided probable cause to prolong the stop for a dog sniff and ultimately search Defendant's vehicle. Nothing on this record shows that any of Trooper McFarland's conduct related to the traffic stop or investigation into the odor of marijuana was "clearly illegal." Instead, the record shows that the traffic stop and marijuana investigation never strayed from, or far from, the line of validity. *See Cannon*, 127 F.3d at 413. Thus, I find that Trooper McFarland's conduct was close enough to the line of validity to justify law enforcement's belief that the search warrants were objectively reasonable. *See id*.

## IV.     CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress. **(Doc. 39.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the

Case 1:24-cr-00030-CJW-MAR     Document 49     Filed 08/08/24     Page 33 of 34

parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

      **DONE AND ENTERED** at Cedar Rapids, Iowa, this 8th day of August, 2024.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa