IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 24-CR-30-CJW-MAR |
| Plaintiff, | **ORDER** |
| vs. | |
| YASIR JINNAH, | |
| Defendant. | |

## I. INTRODUCTION

This matter is before the Court on defendant's Motion to Suppress. (Doc. 39). The government filed a timely resistance. (Doc. 45). The Court referred defendant's motion to the Honorable Mark A. Roberts, United States Magistrate Judge, for a Report and Recommendation ("R&R"). On July 11, 2024, Judge Roberts held a hearing on the motion to suppress. (Doc. 48). Then, on August 8, 2024, Judge Roberts recommended the Court deny defendant's motion to suppress. (Doc. 49). On August 22, 2024, defendant objected to Judge Roberts' R&R. (Doc. 66). For the following reasons, the Court **adopts** Judge Roberts' R&R (Doc. 49), **overrules** defendant's objections (Doc. 66), and **denies** defendant's Motion to Suppress (Doc. 39).

## II. STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* FED. R. CIV. P. 72(b) (stating identical requirements). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time. *Id*. If a party files an objection to the magistrate judge's report and recommendation, the district court must review the objected portions de novo. 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate [judge]'s report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

### III. FACTUAL BACKGROUND

After reviewing the record, the Court finds Judge Roberts accurately and thoroughly set forth the relevant facts in the R&R. In his objections, defendant does not contest any of Judge Roberts' factual findings. (Doc 66). The Court adopts Judge Roberts' summary of the facts here.

> On February 13, 2023, Trooper McFarland[1] was working on Interstate 80 in Cedar County, within the Northern District of Iowa. At

---

[1] Prior to working for the Iowa State Patrol, Trooper McFarland was employed by the Iowa Department of Transportation's Motor Vehicle Enforcement Division. Trooper McFarland graduated from the Iowa Law Enforcement Academy. Additionally, Trooper McFarland has completed advanced roadside impaired driving enforcement school and is also a certified recognition expert for detection of drug impaired driving. Trooper McFarland is also a canine handler. Trooper McFarland attended the Nebraska State Patrol Canine Handler School, graduating with his dog as a certified drug detector and patrol dog team. Trooper McFarland and his patrol dog re-certify annually and were certified at the time of the vehicle stop at issue here. Defendant raises no issue with regard to Trooper McFarland's dog's training or certification.

approximately 5:46 p.m., Trooper McFarland was parked in his patrol on a hard crossover near mile marker 276 and observed a black Chevy Malibu traveling eastbound at a speed well below the posted speed limit. Trooper McFarland noted that the Malibu maintained its speed below the posted speed limit as it approached him and appeared to decrease its speed as it passed him. (McFarland Hr'g Test. at 8-9.) Trooper McFarland also observed the driver of the Malibu as it passed him and noted that he looked "extremely rigid" in an uncomfortable driving position with his arms locked out on the steering wheel. Trooper McFarland stated that Defendant's driving position was atypical of normal driving behavior. Trooper McFarland testified that drivers are typically more relaxed. He stated that having one's arms locked out and rigid on the steering wheel is uncomfortable and a sign of anxiousness. (*Id.* at 9.) Further, as the Malibu proceeded past where Trooper McFarland was stationed, he observed it drift over the fog line, the line on right side of the lane "that separates the driving lane from the shoulder of the roadway." (*Id.* at 10.) After the car passed him, Trooper McFarland pulled onto Interstate 80 to catch up and he observed it cross over the fog line a second time. (*Id.*)

Trooper McFarland explained that he pursued the vehicle because, in his training and experience, the Malibu's speed, well below the posted speed limit, as well as the failure to maintain its lane, and the driver's nervous behavior were consistent with an individual who was either potentially impaired or potentially involved in criminal activity. (*Id.*) When he caught up to the vehicle, Trooper McFarland pulled up parallel to it. Trooper McFarland stated that he wanted to see if the driver was on his cellphone or texting to perhaps explain why the vehicle had drifted over the fog line twice and why Defendant's driving behavior was atypical. Trooper McFarland did not observe anything to cause distracted driving behavior. (*Id.* at 11.) Trooper McFarland also noted that as he approached the vehicle it reduced its speed to 53 miles per hour in a posted 70 mile-per-hour zone. Additionally, Trooper McFarland observed that the driver remained in the rigid and unrelaxed driving position observed earlier. Further, Trooper McFarland noted that the driver would not take his eyes off the road and would not look over at him. Trooper McFarland testified that typically, when he pulls up next to a vehicle that he suspects may have an impaired driver, generally the driver will at least glance over at him. However, Defendant continued to look forward the entire time Trooper McFarland was next to him. At this point, Trooper McFarland decided to conduct a traffic stop of the car. (*Id.* at 11-12.)

3

After he stopped the car, Trooper McFarland approached the vehicle on the passenger side and spoke to the driver through the front passenger window. Trooper McFarland testified that as he approached the front passenger window, he briefly smelled marijuana coming from inside the vehicle, but the smell quickly dissipated.[2] (*Id.* at 13-14.) Trooper McFarland identified the passengers of the vehicle by their drivers' licenses. Defendant was the driver of the vehicle, and his passenger was co-defendant Daniella Maldonado. Trooper McFarland told Defendant that he stopped his vehicle because he observed Defendant drive on the fog line and wanted to check and make sure Defendant was not an impaired driver. (*Id.* at 14-15.) He also advised Defendant that he would likely receive a warning. Trooper McFarland explained that, if he determines that the motorist is not impaired, he typically gives the driver a warning for any fog line violation. (*Id.* at 15.)

During the encounter, Trooper McFarland noted that Defendant was "very nervous." (*Id.*) Trooper McFarland testified that, when he asked Defendant to exit the vehicle and accompany him to his patrol car, Defendant grabbed the steering wheel in the same rigid manner that observed [sic] earlier with both of Defendant's arms locked out and Defendant staring straight ahead. Trooper McFarland also observed Defendant's arms and torso trembling. (*Id.*) Trooper McFarland asked Defendant to step out of his vehicle a second time and this time Defendant complied and accompanied Trooper McFarland to his patrol car. (*Id.* at 16.) In the patrol car, Trooper McFarland asked Defendant about his travels. Defendant told Trooper McFarland that he was going to Bolingbrook, Illinois for two or three days to visit his mother. (*Id.* at 16-17.) Trooper McFarland also asked Defendant why he was driving so slowly, and Defendant replied that he did not want to get caught speeding. (*Id.* at 17.) Further, Trooper McFarland inquired whether Defendant had any drugs or weapons in his car. Defendant denied having either in the vehicle. (*Id.* at 18.) Trooper McFarland noted that Defendant's demeanor in the patrol car was "very anxious," "very nervous," and he could see Defendant's heart beating rapidly through the carotid artery in Defendant's neck and through Defendant's T-shirt.[3] (*Id.* at 17.) Trooper McFarland

---

[2] Trooper McFarland testified that the smell of marijuana did not come from a passing car. (McFarland Hr'g Test. at 14.)

[3] At the time of the traffic stop, Defendant was wearing a long sleeve flannel shirt with a vest. (McFarland Hr'g Test. at 66; Def. Ex. A at 2:31.)

asked Defendant for consent to search his car. Defendant denied consent. (*Id.* at 18.)

Trooper McFarland testified that he believed he had probable cause to search Defendant's vehicle based on the odor of marijuana that he smelled when he initially spoke to Defendant through the front passenger window. (*Id.*) However, because the odor dissipated quickly, out of an "over abundance of caution," Trooper McFarland decided to run his dog around Defendant's car to further support his probable cause to search. (*Id.*) Trooper McFarland testified that after he issued the warning citation, his investigation was not complete as he intended to further investigate the odor of marijuana he initially smelled emanating from the vehicle. (*Id.*)

Trooper McFarland informed Defendant that he was going to run his dog around the car. He asked Ms. Maldonado to exit the vehicle and once she exited the car, Trooper McFarland retrieved his dog and ran the dog around the car. (*Id.* at 19.) The dog alerted on the front passenger door by sitting, its final indication. (*Id.* at 20; Def. Ex. A at 15:58-16:19.) Trooper McFarland searched the vehicle. He found a loaded handgun with a 15-round magazine in the center console of the car.[4] A second spare 15-round magazine was also located in the center console. Trooper McFarland also found a pink camouflage backpack in the car. Inside the backpack, Trooper McFarland found three additional loaded 30-round handgun magazines, a trauma bleed stop kit, and a small empty pouch that smelled of marijuana. Additionally, Trooper McFarland noted that there were no overnight bags or personal hygiene items in the car. (*Id.* at 21-22.)

After finding the firearm, Trooper McFarland conducted a criminal history check on Defendant and Maldonado. Maldonado had no criminal record. He learned that Defendant had a felony conviction for unlawful sale of a firearm without proper credentials. Thus, as a convicted felon, Defendant was prohibited from possessing a firearm. Trooper McFarland began the process of arresting Defendant for being a felon in possession of a firearm, however, Maldonado claimed ownership of the gun. She told Trooper McFarland that she purchased the gun at Cedar Valley Outfitters in Marion, Iowa. After speaking with Maldonado, Trooper McFarland released Defendant, seized the gun for further investigation, and advised

---

[4] The handgun was set up for a left-handed shooter. Maldonado is right-handed. Defendant is left-handed. Maldonado, who claimed ownership of the gun told Trooper McFarland that it was set up for a left-handed person because she practices shooting with both hands. (Def. Ex. B, Doc. 40-1.)

Defendant that as a felon he was prohibited from being around firearms. (*Id.* at 23-24; Def. Ex. B, Doc. 40-1.)  Trooper McFarland then let Defendant and Maldonado leave.

Later, Trooper McFarland contacted Cedar Valley Outfitters and confirmed that Maldonado had purchased the firearm from them.  Also, the employee from Cedar Valley Outfitters with whom Trooper McFarland spoke expressed some suspicions/concerns based on the number of guns Maldonado had been purchasing from them.  Trooper McFarland also performed an open-source social media search on Defendant and Maldonado.  Lastly, Trooper McFarland contacted ATF Agent Robert Friend regarding Defendant and Maldonado, passing on the information he had learned about Maldonado and the gun.  At some point, he delivered the seized firearm to Agent Friend.[5] (*Id.* at 24-26.)

(Doc. 30, at 4-10 (footnotes in original).

## IV. ANALYSIS

In his objections to Judge Roberts' R&R, defendant argues that Judge Roberts erred in his legal conclusion that Trooper McFarland had grounds to stop defendant. (Doc. 66, at 2-5).  Generally, defendant urges that the facts observed by the trooper do not give rise to probable cause for stopping his vehicle, relying primarily on a United States Supreme Court decision and an unpublished decision from the Sixth Circuit Court of Appeals.  Defendant also argues that Judge Roberts erred in applying the *Leon* good faith exception to the exclusionary rule because, in defendant's view, Trooper McFarland's stop was so lacking in indicia of probable cause that no reasonable officer would have believed the connected search warrants provided probable cause for the search warrants.  (*Id.*, at 5).  Defendant did not specifically object to Judge Roberts' legal conclusion that the traffic stop was not unconstitutionally prolonged or identify any

---

[5] While there was no testimony on the subject, it is clear from Defendant's Exhibits B and C that Agent Friend obtained two separate search warrants for Defendant's and Maldonado's residence, persons, and personal vehicles (the vehicle that Defendant was driving when he was stopped on February 13, 2023 was a rental car).

error in Judge Roberts' analysis, but defendant incorporated, by reference, his previous arguments. (Doc. 66, at 1). So, the Court will address the legality of the prolongment of the stop as well.

### A. Investigative Stop: Traffic Violations

A traffic stop constitutes a seizure for purposes of the Fourth Amendment, and therefore must be supported by probable cause or reasonable, articulable suspicion that criminal activity has occurred or is occurring. *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021). "Reasonable suspicion is a less demanding standard than probable cause[.]" *Alabama v. White*, 496 U.S. 325, 330 (1990).

Probable cause is present when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Shackleford*, 830 F.3d 751, 753 (8th Cir. 2016) (cleaned up). "A[n] officer has probable cause . . . when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (cleaned up). "[T]he mere probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, is all that is required." *United States v. Winarseke*, 715 F.3d 1063, 1067 (8th Cir. 2013) (internal citation and quotations omitted).

In contrast, reasonable suspicion requires that an officer be "aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *United States v. Hollins*, 685 F.3d 703, 705 (8th Cir. 2012) (citation and internal quotation marks omitted). Whether under the probable-cause standard or reasonable-suspicion standard, an officer's subjective intentions play no part in the analysis. *Whren v. United States*, 517 U.S. 806, 813 (1996).

7

Defendant urges that his conduct—driving well under the speed limit, crossing the fog line twice, maintaining a rigid position holding the steering wheel, and not looking at the patrol car driving alongside his own on the interstate—are insufficient signs of criminal activity to stop his vehicle. The Court disagrees. Although none of this conduct gives rise to probable cause to charge defendant with any driving offense, that does not mean that they do not give rise to a reasonable suspicion of criminal conduct, particularly an impaired driver. An officer does not need to observe a violation of the law to temporarily stop a person to investigate a possible violation of the law; rather, the officer need only have reasonable suspicion of criminal conduct. *See, e.g.*, *Kansas v. Glover*, 589 U.S. 376, 380 (2020). Here, defendant's conduct was sufficiently unusual, when viewed in the light of a reasonable officer in Trooper McFarland's position, to warrant further investigation through a temporary stop.

Defendant's citation to the Supreme Court's decision in *United States v. Arvizu*, 534 U.S. 266 (2002), is misplaced. The quoted language (Doc. 66, at 2) is taken out of context. There, the Supreme Court was being critical of the Court of Appeals for the Ninth Circuit's narrow approach and failure to consider the totality of the circumstances. 534 U.S. at 275-76. The Supreme Court was not holding that "a driver's slowing down, stiffening of posture, and failure to acknowledge a law enforcement officer" does not give rise to a reasonable suspicion, even in San Francisco—or, by extension, I-80—for that matter. What the Court emphasized in this discussion was the importance of considering the totality of the circumstances when assessing whether a reasonable officer would have reason to believe that criminal activity was afoot, especially "in light of his specialized training and familiarity with the customs of the area's inhabitants." *Id*. In that regard, Trooper McFarland testified that based on his familiarity with the customs of the people he encounters on patrol in Iowa, defendant's behavior was unusual. That

8

testimony, which Judge Roberts found credible (Doc. 49, at 3), warrants credence when considering whether Trooper McFarland had a basis to stop defendant's car.

Defendant's reliance on the Sixth Circuit decision in *United States v. Warfield*, 727 Fed. App'x 182 (6th Cir. Apr. 13, 2018) (unpublished), is equally unwarranted for several reasons. First, as an unpublished decision, it is not binding even on courts within the Sixth Circuit. *See* 6th Cir. R. 32.1. Second, as an out-of-circuit decision, it has no binding effect on this Court. Third, the Court finds it lacks any persuasive value because it is legally and factually distinguishable, and its reasoning flawed. Much of the language from the decision which defendant cites relates to that court's analysis of whether the conduct gave rise to probable cause to stop the vehicle. Here, the Court's focus is on whether defendant's conduct gave rise to a reasonable suspicion to stop the car.[6]

As to the *Warfield* opinion's discussion of reasonable suspicion, this case is factually distinguishable because there the court explained away the driver's very slow speed by emphasizing that it was "easily attributable to driving through a construction zone" shortly before the officer observed the defendant driving slowly. 727 Fed. App'x, at 187. Here, there was no such explanation for defendant's conspicuously slow driving on an interstate highway. Regardless, the Court finds the reasoning in *Warfield* warped. There, the court engaged in the cardinal fault of taking each respective fact and individually rejecting it away by coming up with a post-hoc non-criminal explanation for the unusual behavior, and repeatedly focusing on the legality of each individual fact in isolation (driving slowly, driving with hands properly on the steering wheel, etc.). In assessing whether an officer has reasonable suspicion to stop a person, courts are never to conduct this type of analysis; rather, they must indeed conduct the opposite analysis.

---

[6] The Court notes that Judge Roberts used the words "probable cause" in his concluding sentence, but the standard he cites immediately preceding those words pertain to reasonable suspicion. (Doc. 49, at 25). The Court assumes Judge Roberts' reference to probable cause instead of reasonable suspicion was a scrivener's error.

The Supreme Court has repeatedly counseled that courts are to consider the totality of the circumstances. *See, e.g.*, *Missouri v. McNeely*, 594 U.S. 141, 158 (2013) (plurality opinion) (collecting cases) ("[A] case-by-case approach is hardly unique within our Fourth Amendment jurisprudence. Numerous police actions are judged based on fact-intensive, totality of the circumstances analyses rather than according to categorical rules, including in situations that are more likely to require police officers to make difficult split-second judgments."). The focus is not on whether there is a possible non-criminal explanation for each fact, but whether all the facts, considered as a whole, would give a reasonable officer reason to believe that criminal activity *might* be afoot. *See Navarette v. California*, 572 U.S. 393, 402 ("Reasonable suspicion depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.") (internal quotations omitted). In short, the Court finds the *Warfield* decision to be wrongly decided, and rejects its holding and its reasoning as flawed.

For these reasons, the Court finds reasonable suspicion existed for the trooper to stop defendant's car.

### B. *Investigative Stop: Prolongment*

The Court has conducted its own research and examination of this matter and agrees with Judge Roberts' findings and conclusions. When a defendant is detained due to a traffic stop "the officer does not need reasonable suspicion to continue the detention until the purpose of the traffic stop has been completed." *United States v. Ovando-Garzo*, 752 F.3d 1161, 1163 (8th Cir. 2014) (quoting *United States v. Bueno*, 443 F.3d 1017, 1025 (8th Cir. 2006)). An officer may complete tasks that are associated with a traffic stop, but once those tasks are finished the purpose of the stop is also complete. *United States v. Fuehrer*, 844 F.3d 767, 772–73 (8th Cir. 2016). An officer can lawfully conduct a dog sniff during a stop as well, "as long as the traffic stop is not extended in order [to do so]." *Id.* at 773.

Here, Judge Roberts reasoned that the traffic stop was not unconstitutionally prolonged. (Doc. 49, at 26). The Court agrees with his conclusion and his reasoning. Once Trooper McFarland smelled marijuana, he had the authority to detain defendant long enough to investigate whether the odor of marijuana came from defendant's car. Together with defendant's nervous behavior and the unusual driving Trooper McFarland observed, there was more than sufficient grounds to detain defendant long enough to have the K9 conduct a free-air sniff. Once the K9 indicated to the odor of marijuana, probable cause existed to search the vehicle.

Thus, the Court adopts Judge Roberts' reasoning and conclusion and finds that the traffic stop of defendant was not unconstitutionally prolonged.

### C. *Attenuation and* **Leon** *Good Faith Exception to Exclusionary Rule*

Judge Roberts found Trooper McFarland seized the gun during the search of the car, which led to a March 28, 2023 search warrant, which in turn led to an April 24, 2024 search warrant, which then led to the indictment in this case. (*Id.*, at 29–30). Judge Roberts concluded that the attenuation doctrine is inapplicable here, meaning that if the initial stop was illegal, the evidence obtained through subsequent search warrants would be excluded as fruit of the poisonous tree. (*Id.*, at 30-31). The government did not object to the R&R. The Court agrees with Judge Roberts' analysis and conclusion.

Judge Roberts went on to find, however, that even if the initial stop violated the Fourth Amendment, the *Leon* good faith exception to the exclusionary rule would nevertheless prevent suppression of the evidence obtained through the subsequent search warrants. (*Id.*, at 31-33). Defendant takes issue with this conclusion, arguing that if the initial stop was illegal, then the *Leon* good faith exception should not apply. (Doc. 66, at 5). The immediate problem with defendant's reasoning is, of course, that the Court has concluded that Trooper McFarland's conduct did not violate defendant's Fourth Amendment rights. Yet, even if the initial stop was illegal, the Court agrees with Judge

11

Roberts that Trooper McFarland's prewarrant conduct was "close enough to the line of validity" such that a reasonable officer executing the search warrants would not have known that probable cause was lacking. *See United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013). To find otherwise would be to hold that Trooper McFarland's prewarrant conduct was "clearly illegal." *Id.* Again, the Court finds that Trooper McFarland did not violate the Fourth Amendment for the reasons set forth above, but even if he did, this would not amount to a case in which "the affidavit in support of the warrant [was] so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*." *United States v. Fiorito*, 640 F.3d 338, 345 (8th Cir. 2011), *cert. denied*, 565 U.S. 1246 (2012) (emphasis in original) (quoting *United States v. Perry,* 531 F.3d 662, 665 (8th Cir.2008)). Suppression is intended to punish and deter knowingly wrongful conduct by officers, and that policy simply has no application here—neither to Trooper McFarland nor the officer(s) who may have executed the search warrants.

Thus, even if the Court is wrong and the initial stop was unconstitutional, the Court finds that a reasonable officer executing the search warrants would not have known those warrants were defective. *See, e.g.*, *United States v. White*, 890 F.2d 1413, 1419 (8th Cir. 1989) ("[E]vidence seized pursuant to a warrant, even if in fact obtained in violation of the Fourth Amendment, is not subject to the exclusionary rule if an objectively reasonable officer could have believed the seizure valid."). Accordingly, the *Leon* exception to the exclusionary rule would apply to prevent suppression of the evidence obtained through the subsequent searches.

## V. CONCLUSION

For the reasons stated above, the Court **adopts** Judge Roberts' R&R, (Doc. 49), **overrules** defendant's objections to the R&R (Doc. 66), and **denies** defendant's Motion to Suppress (Doc. 39).

**IT IS SO ORDERED** this 23rd day of September, 2024.

_____
C.J. Williams, Chief Judge
United States District Court
Northern District of Iowa